UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MELKIOR LUMENTUT, | No. 2:12-cv-02463 MCE GGH (HC) |
| Petitioner, | |
| v. | FINDINGS AND RECOMMENDATIONS |
| JAMES HARTLEY, | |
| Respondent. | |

*Introduction and Summary*

Petitioner was convicted of forcible sex crimes in October 2009, and was sentenced to ten years in prison. One claim was raised on appeal—that of insufficient evidence on the issue of forcible restraint. Petitioner thereupon embarked upon successive petitions in the state court system, raising one issue, then others, and then still more. The state courts issued rulings procedurally defaulting the latter claims. For the reasons set forth below, the petition should be denied on the merits in part and as procedurally defaulted in part.

*Facts of the Conviction*

The California Court of Appeal succinctly related the facts. Where necessary in the individual sections, the undersigned will delve further into the substantive facts.

1

The parties relate the entirety of the evidence at trial to support their disparate views on the victim's factual account. As the trier of fact has rendered its judgment on the issue of credibility in favor of the victim, which we may not revisit (People v. Barnes (1986) 42 Cal.3d 284, 303-304; People v. Mayberry (1975) 15 Cal.3d 143, 150), we focus our own account of the facts on the victim's testimony relating to restraint.

In April 2008 the victim moved to a townhouse apartment. Defendant was one of her adjacent neighbors. Their back patios were accessible through sliding glass doors. The victim was five feet one inch tall. Defendant was several inches taller, worked out on a regular basis, and was a tae kwon do (martial art) instructor.FN1 The victim had very limited contact with defendant in the first three months that she lived there.

FN1. The parties do not refer us to any testimony about his exact height or weight; the probation report lists them as five feet seven inches and 167 pounds.

In late June 2008 the victim had her husband arrested for domestic violence. The following day, defendant kept attempting to speak with her. At 10:30 that night, there was a knock on her front door. When she answered, it was defendant, who told her she needed to go to her back patio and look at her car. They walked through their separate apartments; when they reached their patios, defendant pointed out that her tire was flat. She began to cry. He put his arm around her and shushed her, suggesting they go into her home to talk about it because he did not want his jealous wife to see him with her. Once inside, she explained about having her husband arrested. Defendant continued to hold and soothe her, and then began to kiss the top of her head. This made her feel very uncomfortable, but she assumed he was simply concerned for her. He told her that he watched out for her and would kill her husband if he saw him hanging around. In response to his question, she falsely told defendant her young son was awake in order to induce defendant to leave. Defendant asked if he could "bother" her "like this" every night. The victim told him no. He assured her that he would fix her tire by the morning, because he was sure that the air had simply been released from the tire and he had an air compressor. The tire was fixed in the morning. The incident left her feeling shaken.

Over the next week, the victim's other neighbor told her he had seen defendant looking in her windows when she was not home. When defendant made queries about the victim, the other neighbor told him to leave the victim alone because she was married. The abnormal interest on defendant's part disturbed the victim.

On July 3 the victim's in-laws had taken her children for the weekend. Returning

2

home that afternoon, the victim heard knocking on her patio door. Going upstairs to look out the back window, she saw defendant on her patio. When she did not answer, defendant began to go back and forth between knocking on the sliding glass door and the front door. She called an old friend to come spend the night with her.

The following night, she was out with friends until 2:30 or 3:00 in the morning. When she woke up, she found that all the tires in the complex had been slashed during the night except for those on her car and defendant's. Later that day, she was on the patio when defendant came home. He started to tell her about the slashed tires and asked where she had been. She told him she had been out with friends, then went inside.

Returning home with friends on the following evening (July 5), the victim listened to a telephone message from the other neighbor, who told her defendant was "acting really strange" and asking questions about her. She drank wine on the back porch with the couple before they left. At her friends' urging, she was going to pack a bag and spend the night at her mother's home. She took the dog outside and smoked a cigarette.

Defendant came outside and told her he wanted to talk with her. She said no and took the dog back inside. Although she had attempted to latch the patio door, defendant was nonetheless able to follow her inside.

He told her she was beautiful and tried to put his arms around her. She grabbed her cordless phone, claiming that she thought there was a call. She pressed 911 and put the phone down, leaving the line open. The dispatch center received the call at about 1:30 a.m. Defendant directed her to turn on the radio so his wife would not hear anything; she complied because she was afraid he would otherwise do "something bad."

After unsuccessfully trying to kiss her mouth, defendant grabbed her right wrist and pulled her out of the dining room into the living room. He asked if they could go upstairs; she said that he should go home. He again began to try to kiss her, licking around her mouth as she kept it closed. He unhooked her bra, lifting it and her shirt above her breasts. He licked and bit her nipples. She was crying and kept telling him to go home. When she did not respond to his demand to go over to the couch, he grabbed her wrist and pulled her there. Unbuttoning her shorts, he yanked them down, pushed her onto the couch, and pulled down her underwear. As she lay there crying and imploring him to go home, defendant began orally copulating her. Defendant penetrated her vagina with his fingers.

> The victim began to scream. There was a knock on the front door, followed by a deputy sheriff identifying himself. The victim ran to the front door; defendant fled out the back. The deputies found him in his own apartment.

*Procedural Facts and Issues*

Petitioner's one issue appeal, insufficient evidence to prove restraint of the victim, was decided on December 8, 2010. Petitioner did seek review with the California Supreme Court, which was denied on February 16, 2011.

The first state habeas petition was filed on August 29, 2011. Although the claim was formally one for ineffective assistance of appellate counsel, this petition simply added specific grounds why the evidence was insufficient—allegedly not raised by appellate counsel.[1] This petition was denied with citations to In re Swain, 34 Cal. 2d 300 (1949) and In re Harris, 5 Cal. 4th 813, 827, fn5 (1993), explained by the Superior Court that the petition was lacking in documentary support. This denial was followed by an appellate court petition on the same grounds, denied without citation on December 15, 2011. Petitioner filed a petition with the state supreme court on February 14, 2012 denied without citation on May 9, 2012.

Petitioner started over again (prior to his state supreme court denial) in the Superior Court alleging this time ineffective assistance of trial counsel claiming that counsel should have objected to petitioner's pretrial statements based on petitioner's need for an interpreter. Also included was a claim that petitioner was convicted on proof which did not meet the reasonable doubt standard (Claim 4 in the federal petition). Finally, trial counsel was faulted for not having performed a reasonable pre-trial investigation, and failure to retain an expert witness (whose potential testimony was not discussed) (Claims 3 and 5 in the federal petition).

/////

---

[1] 1. The victim was not credible; 2. Lack of objective corroborating evidence; 3. The victim's partying with friends on the night of the attack; 4. Reliance on the defense investigator's testimony that the victim had lied.

In an explained decision, the Superior Court found on April 2, 2012, that this second petition in that court was successive, citing, among other cases, In re Robbins, 18 Cal. 4th 770, 811-812 (1998), In re Clark, 5 Cal. 4th 750, 774-775 (1993), and In re Harris, 5 Cal. 4th 813, 813, 842 (1993). The claims were also denied, in the alternative, on the merits.

Shortly thereafter, petitioner filed this same petition in the Court of Appeal which was denied on April 26, 2012 without citation. Again, petitioner filed with the California Supreme Court on May 18, 2012 with the result that this second petition was denied with citations to Clark, 5 Cal. 4th at 767-769, People v. Duvall, 9 Cal. 4th 464, 474 (1995), Swain, 34 Cal. 2d at 304, and finally, In re Lindley, 29 Cal. 2d 709, 723 (1947). The citations, at the pages cited, stand for various and separate concepts: Clark—successive petitions; Duvall—commences with a discussion of habeas practice, point here is unclear to the undersigned; Swain—vague, conclusory allegations are insufficient; Lindley—trial court "record" errors not reviewable in habeas.

The issues raised in this petition are categorized as procedurally defaulted issues, and those two claims to be decided on the merits.

*Procedural Default*

Those claims procedurally defaulted are all ineffective assistance of trial counsel claims (Claim 3 and 5), and Reasonable Doubt—Elements of the Charge (Claim 4).

> "A federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.' " Kindler, 558 U.S., at ——–, 130 S.Ct., at 615 (quoting Coleman v. Thompson, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)). The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits. See Sykes, 433 U.S., at 81–82, 90, 97 S.Ct. 2497.
> ∗∗∗
> To qualify as an "adequate" procedural ground, a state rule must be "firmly established and regularly followed." Kindler, 558 U.S., at ——, 130 S.Ct., at 618 (internal quotation marks omitted). FN4 [omitted] "[A] discretionary state procedural rule," we held in Kindler, "can serve as an adequate ground to bar

5

federal habeas review." Ibid. A "rule can be 'firmly established' and 'regularly followed,' " Kindler observed, "even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." Ibid. California's time rule, although discretionary, meets the "firmly established" criterion, as Kindler comprehended that requirement. The California Supreme Court, as earlier noted, framed the timeliness requirement for habeas petitioners in a trilogy of cases. See supra, at 3 [citing Clark, Robbins, and In re Gallego, 18 Cal. 4th 825, 77 Cal. Rptr. 2d 132 (1998). Those decisions instruct habeas petitioners to "alleg[e] with specificity" the absence of substantial delay, good cause for delay, or eligibility for one of four exceptions to the time bar. Gallego, 18 Cal.4th, at 838, 77 Cal.Rptr.2d 132, 959 P.2d, at 299; see Robbins, 18 Cal.4th, at 780, 77 Cal.Rptr.2d 153, 959 P.2d, at 317.

Walker v. Martin, __U.S.__, 131 S. Ct. 1120, 1127-1128 (2011) (abrogating Townsend v. Knowles, 562 F.3d 1200 (9th Cir. 2009)).

The only procedural bar[2] that need be discussed here is that of successive petition, i.e., a Clark bar, as all of the aforementioned claims (with two exceptions noted) were brought in a successive petition. In addition to the substantive law regarding procedural default, the Ninth Circuit has constructed a procedural process for invocation of the bar. First, a respondent must expressly invoke the bar. Second, a petitioner must articulate specific reasons why he believes the bar to be invalid under federal procedural default law. An exception to this specific articulation is the situation where the Ninth Circuit has previously held the bar to be inadequate, or not clearly established/regularly followed; in this situation all a petitioner need do is object to the invocation of the bar. If petitioner meets his burden, respondent then has the ultimate burden of proving the legitimacy of the bar. See Bennett v. Mueller, 322 F.3d 573 (9th Cir. 2003); King v. Lamarque, 464 F.3d 963, 967-68 (9th Cir. 2006).

In this case, respondent did invoke the bar of successive petition, Answer at 11-13, and it is obvious that the successive petition bar applied to all claims set forth in the second set of habeas petitions, in that the character of a successive or second petition does not change according to what claims are contained within the successive petition. While claim

---

[2] The undersigned refers to procedural default and procedural bar interchangeably.

1  specific bars must be unambiguously invoked for the specific claim to be defaulted,
2  Chambers v. McDaniel, 549 F.3d 1191, 1197 (9th Cir. 2008), a successive petition, by
3  definition, references all claims contained within—whether truly successive (a repeated
4  claim) or abusive (raising a new claim).

5        While the Ninth Circuit has previously refused to legitimize the Clark timeliness
6  procedural bar, there is no such case law regarding successive petitions determined to be so
7  post-Clark. See Stancle v. Clay, 692 F.3d 948, 957 (9th Cir. 2012): "We agree that
8  California courts do not generally review unjustified successive petitions. See In re
9  Morgan, 50 Cal.4th 932, 114 Cal.Rptr.3d 591, 237 P.3d 993, 1001 (2010) (Corrigan, J.,
10  concurring and dissenting); In re Clark, 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 855 P.2d 729,
11  740–42 (1993)." See also Siripongs v. Calderon, 35 F.3d 1308, 1318 (9th Cir.1994)
12  (concluding that *before* Clark, California's successive petition rules were not adequate and
13  independent).

14        Moreover, one could reasonably argue, and the undersigned so finds, that the
15  Supreme Court's disavowal of the Ninth's Circuit's objections to invocation of Clark in the
16  timeliness context also stood to disavow any objection to the related, successive petition
17  bar. After Martin, petitioner would have the burden of specific articulation of reasons why
18  the successive petition bar could not be applied to his case.

19        In any event, petitioner made *no objection whatsoever* to invocation of the bar,
20  much less a specific articulation why the bar could not be applied. Therefore, respondent
21  did not bear the burden of validating the bar. Claim 4 (Reasonable Doubt) is clearly
22  defaulted as successive.

23        However, one point need be finally considered—the equitable point that with
24  respect to the ineffective assistance of *trial* counsel claims posited in the petition (Claims 3
25  and 5)—procedural default incurred because of failing to raise this claim in the initial
26  petition, which generally cannot be reviewed on appeal, may be excused.[3] Such was the

---

[3] Here only trial counsel need be considered because the undersigned will review the ineffective appellate counsel claims on their merits.

holding of Martinez v. Ryan, __U.S.__, 132 S. Ct. 1309 (2012).

In Martinez, the Supreme Court relaxed the Coleman cause-and-prejudice standard for excuse from procedural default in a narrow category of cases. Martinez had been convicted in Arizona, which categorically forbade a prisoner to raise a trial-counsel IAC claim on direct appeal. Martinez, 132 S.Ct. at 1313. The first time a claim of trial-counsel IAC could be raised was on initial state-court collateral review. Id. Martinez's state postconviction counsel failed to raise a claim of trial-counsel IAC in initial-review state-court collateral proceedings. Id. This failure resulted in procedural default of the IAC claim. Id. at 1314. Our court applied Coleman's cause-and-prejudice standard for excuse from procedural default. Martinez v. Schriro, 623 F.3d 731, 735 (9th Cir.2010). The Supreme Court reversed.

\*\*\*

The Court reaffirmed Martinez a year later in Trevino v. Thaler, ——U.S. ——, 133 S.Ct. 1911, 185 L.Ed.2d 1044 (2013). In Martinez, Arizona law had categorically forbidden a criminal defendant from raising a claim of trial-counsel IAC on direct appeal, requiring instead that such a claim be raised in an initial-review collateral proceeding. In Trevino, Texas law did not categorically forbid a criminal defendant from raising a claim of trial-counsel IAC on direct appeal. Trevino, 133 S.Ct. at 1915. But the Court recognized that it was "highly unlikely" that appellate counsel would have a "meaningful opportunity" to raise such a claim. Id. at 1921. The Court held that, in this circumstance, a procedural default of an underlying trial-counsel IAC claim by postconviction counsel could be excused upon a finding of "cause" under the standard articulated in Martinez. Id.

The Court in Martinez established a four-part test for excuse of a procedural default of a trial-counsel IAC claim by an ineffective postconviction counsel. The procedural default may be excused if there is "cause" for the default. "Cause" under Martinez has a different meaning than under Coleman. "Cause" is established under Martinez where

(1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] ... be raised in an initial-review collateral review proceeding."

Trevino, 133 S.Ct. at 1918 (alterations in original). As described above, Trevino

slightly modified the fourth requirement to allow a finding of "cause" where it is "highly unlikely" that an IAC claim can be raised on direct appeal. Id. at 1921.

Ha Van Nguyenv v. Curry, 736 F.3d 1287 (9th Cir. 2013) (*pro* se petitioners benefit from the Martinez rule.)

Petitioner *pro* se meets steps 2, 3 and 4 (as modified by Trevino).

However, petitioner does not raise a substantial claim of ineffective assistance of trial counsel. Two claims are posited by petitioner: Failure to object to statements made during pre-trial questioning without an interpreter being present (Claim 3), and failure to obtain a DNA expert/move to exclude the prosecution's DNA evidence (Claim 5).

Taking the latter claim first, petitioner does not proffer what a DNA expert would have said. While petitioner asserts in his traverse that he should not be expected to recite here what a witness would have said at trial, unfortunately for petitioner, habeas corpus jurisprudence requires such an elaboration. No information whatsoever is given as to why this expert was needed; petitioner simply supposes that an expert would have helped his case. Any showing of merit is completely lacking.

Similarly, simply stating that trial counsel should have moved to exclude the prosecution's DNA evidence as unreliable, and nothing more, cannot possibly be viewed as a valid claim worthy of pursuing on the merits. Petitioner presents not one single fact to back up the assertion.[4]

Turning to the next issue, that of the pretrial interpreter, petitioner claims that his trial counsel was ineffective because he did not object to the pre-trial statements elicited by the police based upon his alleged limited knowledge of English. Petitioner also cites to an

---

[4] The evidence shows that the DNA evidence was anything but unreliable. Although petitioner's DNA was not found on a labia swab of the victim, it was found, very consistently with the facts of the case, on the victim's neck and breast, RT 346, 349 and 352. Also, petitioner's right palm demonstrated the presence of the victim's DNA. As explained by the DNA witness, it was not unusual to find only the host's DNA in a lab in a labia swab when the alleged method of the perpetrator's invasion was a licking. In that situation the host's DNA could overwhelm that of other contributors. Petitioner characterizes the DNA findings as inconclusive; not so, in that there was no other explanation of the presence of petitioner's DNA on the victim aside from an assault. One's saliva simply does not deposit on another's breast by accident.

apology (to the victim) letter drafted by the police which they persuaded the English challenged petitioner to sign. Especially emphasized is the fact that the trial court acquiesced in his request for an Indonesian interpreter, thereby "proving" that he could not speak English very well:

The Court: Is it accurate to say Mr. Lumentut does speak English, but not sufficiently for him to try this case without interpreters?

Mr. Farina: That is correct.

RT 90

Two potential problems exist—(1) was petitioner's Miranda waiver voluntary, knowing, intelligent, and (2) was a lack of understanding during pretrial questioning so apparent that a due process violation occurred when it was clear that the suspect was not aware of what was being asked, or even what he was saying. However, the problems are only potential because *no* pretrial statement obtained by the police was ever used at trial. Petitioner is reduced to arguing that he was not given a fair chance to respond to the police investigation, or prepare for, or avoid, trial in the first place, because he was at a disadvantage with the police. Such a claim is certainly novel, but just as certainly, it is not clearly supported by established Supreme Court authority. The undersigned knows of no case dealing with a lack of English knowledge regarding pretrial questioning where the defendant's allegedly ill understood statements were not a fixture in the trial. Compare, United States v. Vallejo, 237 F.3d 1008,1014 (9th Cir. 2001) and cases cited therein.[5]

Petitioner also claims that his attorney's failure to have an interpreter present at all meetings prior to trial rendered petitioner "not cognizant" of the case against him.

---

[5] If petitioner could ever hurdle his threshold problem of non-use of statements, he would not be likely to prevail. Petitioner had obtained a degree in the dental technician area (albeit from and Indonesian school), and judging from his co-workers letters at sentencing, was proclaimed by his coworkers to be a highly proficient worker. It is doubtful that he was able to accomplish this without an adequate ability to communicate in English. Moreover, petitioner was never at a loss to relate herein precisely what was said to him by the victim, and what other lay witnesses had to say as well-- no question of not being able to understand when petitioner desires to make a point. In all probability, petitioner was exaggerating any English speaking/hearing deficiency.

1  However, this bald conclusion, devoid of description and impact, is clearly insufficient to
2  proceed further.  See Greenaway v. Schriro, 653 F.3d 790, 804 (9th Cir. 2011) citing James
3  v. Borg, 24 F.3d 20, 26 (9th Cir. 1994)
4        Accordingly, the only claims that survive for review on the merits are the
5  insufficient evidence of restraint claim and the related ineffective assistance of appellate
6  counsel.
7  *Insufficient Evidence*
8        "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging
9  the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."
10  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir.2005). Sufficient evidence supports a conviction if,
11  viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could
12  have found the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia,
13  443 U.S. 307, 319, 99 S. Ct. 2781 (1979).  "After AEDPA, we apply the standards of Jackson with
14  an additional layer of deference."  Juan H., 408 F.3d at 1274.  See also the AEDPA standards set
15  forth in respondent's brief.  Moreover, petitioner's challenge to the sufficiency of evidence based
16  on credibility of the witnesses is not cognizable in an insufficient evidence claim.  See McMillan
17  v. Gomez, 19 F.3d 465, 469 (9th Cir.1994); see also Schlup v. Delo, 513 U.S. 298, 330, 115 S. Ct.
18  851 (1995) (recognizing that the credibility of witnesses is generally beyond the scope of
19  sufficiency of the evidence review).
20        As stated above, the insufficient evidence of restraint and the ineffective assistance of
21  appellate counsel are essentially the same claims; in the latter, petitioner describes further
22  examples of evidence, purportedly in his favor, with which he seeks to have the conviction
23  vacated.  Therefore, both claims will be discussed in this section.
24        Petitioner, of course, does not understand all the ins and outs of habeas corpus;
25  nevertheless, there are some limits past which even a pro se petitioner cannot go.  One of these is
26  attempting to testify for the first time in a habeas petition when the issue is insufficient evidence—
27  a record bound inquiry.  Petitioner did not testify at trial, and he cannot introduce testimony here
28  to counteract the prosecution's case.  Much of petitioner's briefing appears to be his present take

1    on events and gross conclusions.  In addition, to the extent petitioner is referencing the record, he
2    does not indicate where in that record the evidence he references exists, making it almost
3    impossible to separate out petitioner's "habeas testimony" from what appears in the record, if it
4    appears at all.

5    Thus, the court has previously set forth the factual summation of the trial given by the
6    Court of Appeal, presumed correct, and will set forth here the analysis of that court on the issue of
7    evidence sufficiency, which petitioner must show to be such a distortion, that reasonable jurists
8    reviewing the record could not come to the conclusion about the sufficiency of the evidence, i.e.,
9    that no reasonable juror could not have arrived at the verdict which this jury did.  Given the
10   limitations of the petition and traverse, all the undersigned can do is make a general record check,
11   especially that pertinent to the defense, to perform the analysis herein.

> Defendant sets forth this sequence of events: he released his grip on the victim's wrist, was rebuffed in his request to go upstairs, then pulled up the victim's bra and shirt to lick and bite her breasts, and did not grab her again until he pulled her over to the couch. Defendant contends this was insufficient evidence of restraint: he was neither holding her nor employing any other form of coercion, and employed only the amount of physical force necessary to accomplish his sexual touching of her breasts. (People v. Pahl (1991) 226 Cal.App.3d 1651, 1661 [unlawful restraint requires more than bare minimum of effort to accomplish act].) Contrasting the facts of Pahl and other cases, he asserts that his conduct was not equivalent.FN2
>
> FN2. It is generally unproductive to contrast the circumstances of other cases on a question of fact, because we must review the sufficiency of the evidence of restraint based on the specific facts in the present record. (People v. Rundle (2008) 43 Cal.4th 76, 137-138; Robison v. City of Manteca (2000) 78 Cal.App.4th 452, 458, fn. 5; State Compensation Ins. Fund v. Brown (1995) 32 Cal.App.4th 188, 202.) We therefore will not digest the holdings of these several cases.
>
> In addition to actual physical force, restraint can be accomplished through words and actions alone, and it is not necessary that there be threats of violence to the victim's person. (People v. Grant (1992) 8 Cal.App.4th 1105, 1111-1112.)
>
> Defendant had unnerved the victim with his fixation on her during the week she was left alone after her husband's arrest, and with his circumstantial connection to the vandalism of her car and others in the complex. He forcibly entered her home

> late at night after she tried to shut him out, and communicated his desire for her. He continued to act on this desire despite her pleas for him to leave. He was taller by several inches, and had been a martial arts instructor. The victim in fact feared his reaction if she resisted him; that he was not successful in directing her to the bedroom upstairs does not mandate a finding of a balance of authority between them (compare People v. Arnold (1992) 6 Cal.App.4th 18, 28-29 [upon deciding she did not like the consensual contact, victim pushed the defendant away and told him to leave] ), since he then immediately sought to gratify himself against her will where they were standing. Under these circumstances, we find ample evidence of defendant's control over the victim to constrain her movements despite the absence of any show of physical force or express threats of violence.

People v. Lumentut at *3.

Petitioner's first point is that he did not force his way into the victim's townhome apartment on the night of the incident. There is partial record support for this contention—his investigator's recounting of the victim's statement to him that the door was open when petitioner entered. RT 375. The problem is that although the door may have been technically "open" when petitioner entered it, there was testimony that petitioner had, without permission, opened the latch of a closed, but not locked door. RT 158, 211-212. The Court of Appeal could reason that this permissionless entry constituted "forcing oneself in."

The primary point raised in this section is petitioner's belief that the evidence showed nothing more than the physical actions necessary to perform the sex acts themselves—that the victim was not "restrained."

Petitioner first recounts the victim's testimony:

> In describing the act underlying Count 4, the victim testified that appellant started to kiss her, and that when she turned her face away, he took her right wrist and pulled her out of the dining room area and into the living room. (1RT 160-161). Appellant started kissing her again she testified (RT 161).

Petition at 16.

The victim had also testified that she told petitioner prior to his grabbing her wrist "Go home. Just go back home to your wife and I won't say anything." RT 159. The [much bigger and stronger] petitioner tried to put his arms around her, and she kept backing up.

13

Id. After this, she attempted a ruse to dial 911. It was at this time that petitioner started to kiss her; she turned her face. He then pulled her out of one room and into another. She also testified that while she was crying, petitioner told her to go to the couch. He pulled her over to the couch where she was pushed into it. RT 161.

Petitioner then testifies in this petition:

> At that moment [start of the sexual activity], appellant did not have his hands on her; he had not threatened her with any harm if she did not comply with his wishes, and he did not use any other means of controlling A.M's liberty.

Petition at 17.

If petitioner means to say that restraint has to be present all the way through the sexual act, he is simply quibbling with the Court of Appeal's pronouncements on the law.[6] If he simply wants to posit his present-day testimony versus that of the victim, he may not do so in contesting the sufficiency of the evidence. Nothing petitioner argues takes away from the Court of Appeal's rendition of the facts and its application of those facts to the law.

*Ineffective Assistance of Appellate Counsel*

In the ineffective assistance of appellate counsel claims, petitioner decries his appellate counsel's failure to impugn trial counsel's "credibility" cross-examination of the victim, a non-starter in insufficient evidence jurisprudence. Points such as trial counsel failed to show that the victim had "spent the better part of the evening and night drinking and partying with friends," Petition at 20, are mystifying in their pertinence—as if a person who decides to party with friends is fair game for petitioner's aftermath. Moreover, the lack of labial/vagina DNA from digital or tongue licking/penetration was the subject of evidence at trial, see footnote 4 above—in any event, petitioner's present theory/testimony about this goes no distance in demonstrating evidence insufficiency: "DNA extraction found on the victim, and not of her own, surely would have matched that of one of her male guests that she had reason to hide her laison (sic) with because her incarcerated husband (that she caused to have arrested for domestic violence) would retaliate if it

---

[6] "Here, by contrast, appellant exhibited neither a comparable show of authority nor engaged in physical acts of restraint while touching A.M's breasts." Petition at 14.

1  were found out." Petition at 20. Trial counsel would have been ineffective if he had tried to make
2  such a point.

3  If these claims are really about appellate counsel's effectiveness in not relating the
4  deficiencies of trial counsel's defense on direct review, as opposed to mere points to add to the
5  insufficiency argument, such also fails. Claims of ineffective assistance of appellate counsel are
6  governed by the same standards as have been set for trial counsel. United States v. Thomas, 417
7  F.3d 1053, 1056 (9th Cir. 2005); see also Turner v. Calderon, 281 F.3d 851, 872 (9th Cir. 2002)
8  (explaining that "[c]laims of ineffective assistance of appellate counsel are reviewed according to
9  the" same standard that applies to trial counsel). See also United States v. Dharni, 738 F.3d 1186,
10 1189-1190 (9th Cir. 2014) (a petitioner must show unreasonable conduct on the part of his counsel
11 and prejudice resulting therefrom). These standards are then given AEDPA deference, i.e, that
12 fairminded jurists could not disagree with the application of ineffective assistance standards by the
13 state courts. White v. Woodall, __U.S.__, __S.Ct.__, 2014 WL 1612424 *8 (2014).

14 But also, and the dispositive factor here, claims of ineffective assistance of trial counsel are
15 very seldom appropriate for direct review. United States v. Steele, 733 F.3d 894, 897 (9th Cir.
16 2013). This is so because why counsel did what he did, the determinative factor in assessing
17 counsel's reasonableness, is nearly always a matter outside the record. Unless the record is fully
18 developed on the matter of "why," or the conduct is so patently unreasonable on its face, can an
19 appellate court on direct review make such an assessment. Id.

20 An appeals court would not have reviewed petitioner's trial counsel accusations on direct
21 review no matter how skilled his appellate counsel. In sexual assault cases, whether defense
22 counsel was aggressive enough on cross-examination of the victim (the bulk of petitioner's
23 charges herein are that counsel should have attacked the credibility of the victim on grounds
24 discussed above), are almost never susceptible to a record review. It is well known that cross-
25 examination of a victim is a delicate matter. Counsel must balance the need to show that the
26 victim may not be telling the truth on some matters, to make it appear that she is not telling the
27 truth on the main issue, with the need not to have the jury believe that the victim is being
28 victimized again by a callous defense counsel. Where counsel strikes that balance is particularly a

1 question of fact outside the record.  Moreover, an issue of why counsel did not hire a particular
2 expert (here a DNA expert) can only be known after counsel announces his reasons, if any, *and* it
3 is shown that the expert may have had something favorable to testify about.  In this case, even
4 petitioner cannot make up his mind on the latter point.  He declares the DNA evidence as being
5 inconclusive thereby necessitating a stronger attack on the victim's credibility, and at the same
6 time declares that an expert would have shown something to favor his case -- a "something" that
7 petitioner does not specify.[7]   No court on direct review could opine on such a matter.

8       Even if the undersigned reached further and looked at issues such as the need for a trial
9 counsel objection to admission or pretrial evidence based on account of a lack of an interpreter
10 (and even if such an objection were possible, see supra, no use of pretrial statements at trial),
11 petitioner's familiarity with the English language is again so fact-bound that only a habeas court
12 could review a claim that trial counsel was ineffective because he did not object to petitioner's
13 pre-trial admissions.[8]  Petitioner's trumpeted point that because he was given an interpreter at trial,
14 he must have needed one when discussing the case with the police, does not follow as a matter of
15 law.  Generally, whenever a defendant speaks only, or primarily, a language other than English,
16 and interpreter will be appointed.  See e.g., 28 U.S.C. section 1827(d)(1).  This determination is a
17 fact matter determined by the trial court and involves numerous factors such as the perceived
18 ability to understand English, the complexity of the issues, and so forth.  See United States v. Si,
19 333 F.3d 1041 (9th Cir. 2003).  It is pointless to ask an appellate court to make this determination.
20 Id. at  1044.  Thus, it would be more pointless for appellate counsel to raise the need for an
21 interpreter pre-trial via an ineffective assistance of counsel claim on direct review—something
22 which would obviously require trial counsel's extra-record perceptions on the subject.

23       Moreover, the standard for interpreter need at trial does not indicate that an accused cannot
24 understand everyday English when conversing with a detective.  (Petitioner seems to have no
25 trouble relating in this petition what the victim and others told him in English).  Petitioner would

---

[7] As set forth in footnote 4, the DNA evidence taken as a whole was very damning to petitioner's case.
[8] Again, petitioner points to no pretrial statement of his that was admitted at trial.

have to prove his everyday English deficiencies outside the record.  Appellate counsel could not raise this issue of trial counsel's ineffectiveness for failing to object to [non-utilized] pre-trial admissions on direct appeal.

*Conclusion*

Accordingly, IT IS HEREBY RECOMMENDED that Claims 3, 4 and 5 should be dismissed as successive; insufficiency of the evidence (Claim 1) and ineffective assistance of appellate counsel (Claim 2) should be denied.

For the reasons set forth above, the undersigned recommends that no Certificate of Appealability be issued.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."

Dated: May 5, 2014

/s/ Gregory G. Hollows

UNITED STATES MAGISTRATE JUDGE